**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

BELINDA STOREY,                    )
                                   )
        Plaintiff,                 )
                                   )
        v.                         )        Case No. 05-cv-4011-JPG
                                   )
ILLINOIS STATE POLICE, *et al.* .  )
                                   )
        Defendants.                )

**MEMORANDUM AND ORDER**

**GILBERT, District Judge:**

This matter is before the Court on Captain Phil Sylvester's (Sylvester) motion for summary judgment (Doc. 38), the Illinois State Police (ISP) and Thomas Stehley's (Stehley) motion for summary judgment (Doc. 40) and Belinda Storey's (Storey) motion to dismiss her claim against Stehley (Doc. 59). Storey has responded to defendants' motions (Docs. 57, 58), defendants have replied to her responses (Docs. 64, 67), and ISP and Stehley have responded to Storey's motion (Doc. 60). For the following reasons, Storey's motion to dismiss will be **GRANTED,** Sylvester's motion for summary judgment will be **GRANTED** and ISP's motion for summary judgment will be **GRANTED in part and DENIED in part**.

**BACKGROUND**

Storey filed her four-count complaint against ISP, Sylvester and Stehley on January 31, 2005, claiming defendants sexually harassed her, committed gender discrimination and retaliated against her, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* (Title VII), and 42 U.S.C. § 1983.[1] (Doc. 1). Storey filed two charges of discrimination with the Equal

_____

[1]The Court dismissed Storey's claims for money damages against Stehley and Sylvester in their official capacities. (Docs. 21, 32).

Employment Opportunity Commission (EEOC) based on the events recounted below.  In her first charge, filed October 2, 2003 (Doc. 44-4 at 1), she claimed Sylvester sexually harassed her, and after she refused his advances, he and others retaliated against her by denying her deserved promotions, imposing unwarranted discipline, and by not giving her sufficient work to do.  She filed her second charge May 1, 2004 (Doc. 44-5 at 2), claiming ISP denied her a liaison position with the FBI for which she was qualified.  She believes ISP denied her this position because of her sex and in retaliation for filing her internal complaint with the Equal Employment Opportunity Office (EEO) of the ISP and her first charge with the EEOC.

Construing the evidence in the light most favorable to Storey, and drawing all reasonable inferences in her favor, the admissible evidence establishes the following facts:

### A.    Pre-Investigation: 1997 to January 2003

From mid-1997 to April 2002, Storey was a police officer assigned to ISP's facility in Carmi, Illinois – District 19.  When she started at Carmi, Storey held the rank of sergeant and was under the supervision of Master Sergeant Ken Clore (Clore).  Storey received satisfactory (or better) employment evaluations during her tenure there.  The tone of these evaluations was demonstrably positive; her evaluators described her as "an asset to the ISP," "an excellent employee," and "a good supervisor." (Docs. 57-5, 57-7, 57-10, 57-12, 57-13).  Two events changed this situation: Sylvester became commander of Zone 7[2] in December 2000 and Storey divorced her husband in February 2001.

---

[2] Zone 7 comprises several districts, including District 19. As the commander of Zone 7, Sylvester was responsible for making all promotion and transfer recommendations within his zone; he was three levels above Storey in rank.  The parties do not dispute that Sylvester was Storey's supervisor for purposes of Title VII.

Sylvester began to ask Storey out, both at work and the gym, almost immediately after her divorce.  Storey eventually agreed to go out with him "as friends" and the two went to Paducah, Kentucky for dinner and a movie on March 10, 2001.  (Doc. 57-73 at 13).  This was the pair's only "date."[3]  After going to Paducah, Sylvester repeatedly asked Storey out and for permission to come to her home.   In response to Sylvester's requests, Storey told him she "wasn't ready for a relationship" and that she was not interested in dating anyone so soon after her divorce.  (*Id*. at 12). Undeterred, Sylvester showed up at Storey's house uninvited on March 16, 2001, with beer and a movie.  Storey let him in, and, eventually, the two kissed.  Storey pushed his hands away when he attempted to touch her breasts and genitals. It is not clear whether Sylvester made physical contact on this occasion.  When Storey told him she was not ready for a physical relationship, he laughed at her and promptly left. (*Id*. at 14-18).  Sylvester's behavior continued unabated despite her rebuff. In May 2001, he showed up at her hotel room (she was staying in a hotel after moving out of her house) uninvited, with beer, several times.  Storey let him kiss her on these occasions but pushed him away when he attempted to touch her breasts and thighs.  (Doc. 57-74 at 4-8, 11-12).  Like before, he laughed at her when she pushed him away.

Clore, Storey's supervisor at District 19, retired in July 2001.  Storey wanted his position and felt, based on Clore's statements and her experience, that she was in line to succeed him.  Sylvester was aware of Storey's desire in this regard.  Sometime in June, Sylvester told her he was in a position "to make [the promotion] happen."  (*Id*. at 13).  This suggestion offended her; she told him she "could get it on [her] own on [her] own merit and work ethic."  (*Id*.).  In July 2001, Storey was appointed acting master sergeant in the Carmi office.  While she held this position (from July 2001

---

[3] Storey and Sylvester had one date in 1984, which culminated in sex.

to March 2002), Sylvester continued to ask her out at the gym and at work.  Storey always refused him.  (*Id*. at 16-18).

Sometime in late 2001, Sylvester directed one of Storey's supervisors, Mervin Gillenwater (Gillenwater), to let her know that he (Sylvester) would like to meet with her.  Sylvester told Gillenwater to find out whether Storey would like to work in the Zone 7 office in Marion.  (Doc. 57-19).  Storey agreed to meet with Sylvester.  At the meeting, Sylvester told her that Al Burton would be replacing her as acting master sergeant in Carmi.  Though Storey did nothing wrong, Sylvester told her he felt Burton was better suited for the job.  (Doc. 57-75 at 3).  Burton did not immediately succeed her, so Storey was left in a state of flux until Sylvester called her after the holidays and told her that she would remain the acting master sergeant indefinitely.  (*Id*. at 4-5).

Though unaware of these activities at the time, in March 2002, Sylvester made contradictory recommendations regarding Storey's fitness for promotion to one of his supervisors, Colonel Charles Brueggemann (Brueggemann).  (Doc. 57-15 at 6).  He recommended both that she remain acting master sergeant in Carmi and that she become his staff officer and transfer to Marion. (*Id*., Doc. 57-20 at 2).[4]  Though some of his comments were apparently negative, at one point, he told Brueggemann that he felt Storey was "his strongest actor." (Doc. 57–20 at 2).  Brueggemann did not want Sylvester to transfer Storey to Marion, so Sylvester had Gillenwater see if Storey would transfer there voluntarily.  After some cajoling, Storey decided to transfer to the Marion office effective April 1, 2002.  (Doc. 57-75 at 11-12, 14).  She feels that Sylvester manipulated her into taking this position both by appealing to her family situation (being closer to her children) and with

---

[4] The staff officer position would have essentially made her Sylvester's assistant, requiring a great deal of personal interaction between the two.  (Doc. 57-78 ¶4).

not so subtle indications that she would not retain her position in Carmi for long.

In July 2002, Sylvester asked a mutual friend, ISP Investigator Don Grazkewicz (Grazkewicz), to "fix" Storey and he up.  (Doc. 57-75 at 72).  Grazkewicz attempted to put together a double date between the couple, and he and his wife.  Storey told Grazkewicz she would think about it, but nothing ever materialized from this exchange. Also in July, Sylvester repeatedly paged Storey while she was on a weekend getaway with her boyfriend.  Storey attempted to return his pages, but Sylvester did not answer his phone.  The next week, Sylvester was upset that Storey did not return his pages and called her into his office to discuss the matter further.  Among other things, Storey told him she was uncomfortable with him paging her for personal reasons.  Sylvester went on to question Storey about her relationship with the man she was seeing.  She told him her current relationship was none of his business.  Sylvester then told her he wanted a relationship with her and that, "We'll date two years before we get married."  (Doc. 57-76 at 1).  She told him that was the worst thing he could say and then promptly left.  In September, Sylvester came into Storey's office and asked her if she was serious with the guy she was dating.  (Doc. 44-5 at 4).  Construing this question yet another dating overture, she told him directly she would not go out with him because he was her captain, and did not feel that the relationship would be proper.  (*Id.*).

Storey received her worst yearly performance evaluation of her career in August 2002.  This evaluation was performed by Master Sergeant Tom Oliverio, her direct supervisor.  (Docs. 57-22 at 1, 57-76 at 2).  Before supervisors in the ISP rate those under their command, the supervisory personnel conduct a group rating session where the officers discuss who they think is ready for promotion.  (Doc. 44-5 at 13).  Oliverio had not been Storey's supervisor for the entire review period, so, during the rating session, Sylvester and Stehley told him Storey had violated ISP protocol

earlier that year when she improperly utilized ISP's Tactical Response Team (TRT).  (Doc. 44-6 at 3).  Apparently, she failed to go through the appropriate chain of command for activating the TRT in late 2001 or early 2002.  (*Id*.). Before the rating session, Oliverio determined the approximate numeric scores he felt each individual subject to his review deserved.  (Doc. 44-5 at 12).  At this point, the facts become disputed.  On the one hand, Storey claims that when she complained to Oliverio about her review, he told her he tried to get her higher ratings, but that his "hands [were] tied."  (Doc. 57-76 at 3).   The record also indicates that he complained to his boss about the pressure he received to give Storey lower ratings; he told her he felt Storey deserved a higher score. (Doc. 57-20 at 3).  On the other hand, in his affidavit, Oliverio claims he neither requested nor received any outside input before he completed Storey's predetermination.  After considering Storey's improper activation of the TRT, he says he may have lowered Storey's numeric rating in one category, one point, but that her rating remained within one or two points of his predetermination figure.  (Doc. 44-5 at 14).

In August 2002, Sylvester promoted Sergeant John Barr (Barr) to acting master sergeant in the Marion office.  Barr had a decidedly troubled professional history; he was reprimanded and suspended a number of times from 1995-1999 for, among other things, utilizing his official vehicle while on duty in furtherance of an extra-marital affair, providing false information, and conduct unbecoming an officer.  (Docs. 57-24, 57-25, 57-26, 57-27, 57-28).  In addition to his extensive disciplinary record, Barr was not certified for a promotion to master sergeant.  Storey was.  (Doc. 57-14 at 12).  Though his August 2002 evaluation was 79, 12 points higher than Storey's that year, some of his previous employment evaluations were substantially lower than Storey's: his rating in 2001 was 48 (to Storey's 79), his rating in 1997 was 44 (to Storey's 63); however, in 1998 he

received a 71 (Storey had a 70).  (Docs. 57-12, at 1, 57-30 at 1, 57-31, at 1, 57-32 at 1, 57-34).  After his promotion, Barr's ratings were substantially lower: he received a 69 in 2003, a 54 in 2004, and a 68 in 2005.  (Docs. 57-35 at 1, 57-36 at 1, 57-37 at 1).  Despite Barr's previous disciplinary problems and history of poor evaluations, the commanding officers in Zone 7 identified Barr as the top candidate for promotion and none felt Storey was ready for promotion.  (Doc. 44-6 at 4, 44-5 at 13).

In October or November 2002, Storey questioned Sylvester regarding Barr's promotion. Among other things, he told her Barr was a "better, stronger man."  (Doc. 57-76 at 8).  In October 2002, Sylvester made several comments to Storey that she found offensive: in the context of a conversation about motorcycles, he asked her if she "[wore] anything under [her] chaps[;]" he also said, "Oh, there's trouble" when he saw her walking down the hall at work.  (Doc. 57-76 at 82-83). In November or December of that year, Sylvester asked Storey what was wrong her.  She told him she was upset about her negative performance evaluation (see below).  In response, he asked her "when are we going to go out again."  (Doc. 57-76 at 17).

Barr became Storey's supervisor in September 2002.  He told Storey sometime in November that Sylvester and Stehley had told him to document negative things about her.  (Doc. 57-76 at 14). Storey asserts that she fulfilled her obligation in this regard on November 14, 2002, when she attempted to submit a negative evaluation, or counseling memo, into Storey's personal file.  Among other things, the evaluation indicated that Storey had been turning in her paperwork late and, most importantly, that she had illegally used a wiretap.  She spoke to Barr about these complaints on November 13, and felt that she had cleared up matters to Barr's satisfaction.  Nevertheless, Barr told her that Sylvester ordered him to put the evaluation in her file anyway.  (Doc. 57-38).  During a

meeting with Sylvester and Stehley about this evaluation on November 18, Storey explained her side of the story.  When she left the meeting, she felt she had resolved the issues raised in the evaluation and that it would not be put in her file.

Barr converted the counseling form into a memo to Stehley, and gave Storey a copy of this memo on December 2, 2002. (Doc. 57-40).  Storey responded to Barr's memo by writing a memo to Stehley of her own.  In this memo, she explained her belief that Stehley and Sylvester had ordered Barr to manufacture evidence against her and that Barr wrote the memo at their direction against his will.  (Doc. 57-41).  She gave this letter to Stehley on January 6.  Stehley responded to Storey by letter on January 8, 2003. (Doc. 57-41). In this letter, Stehley denied that he and Sylvester ordered Barr to "try and get documentation of wrongdoing" by her on paper.  Stehley said they were satisfied with her explanations regarding the wiretap, but still felt the other information in the memo was correct.  Thus, he ordered Barr to make a change to the memorandum, the corrected copy of which was dated January 8 and put into her file.  (Doc. 57-43).

**B.      Storey's Internal Complaint and Subsequent Investigation**

On December 11, 2002, pursuant to her request, the EEO's Program Manager, Suzanne Bond (Bond), mailed Storey an ISP discrimination complaint form.  (Doc. 57-44).  Storey met with Bond to discuss her complaint on January 6, 2003.  (Doc. 57-77 at 14-15).  She told Bond of Sylvester's pursuit of her, and Bond then added sexual harassment allegations to the complaint, which was officially filed January 7, 2003.  (*Id.*).

After the complaint was filed, Sylvester's supervisor, Lt. Colonel Terry Remelius (Remelius) hand-delivered a letter from his boss, Brueggemann, informing Sylvester of Storey's allegations.  (Doc. 44-10 at 12).  In this letter, Brueggemann told Sylvester to take his personal things from the

Marion office and to work from the Effingham office until further notice.  Brueggemann ordered Sylvester not to return to the Marion office without permission, not to discuss the complaint with anyone but the investigators and not to act in Storey's chain of command.  (Docs. 44-5 at 7, 44-10 at 3, 44-10 at 12).

The EEO and the Division of Internal Investigations (DII) began their joint investigation of Storey's complaint on January 10, 2003.  (Doc. 57-29 at 1).  They conducted interviews of the principal actors during the next several months, but did not interview Sylvester until April 23. (*Id.*)  The DII submitted its report on June 24, 2003.  Based on the information Sylvester admitted, it concluded that Sylvester improperly discussed the investigation with ISP employees after he was instructed not to do so and that he improperly had a personal relationship with a subordinate.  (Doc. 57-47 at 1).

The EEO made its determination on July 14, 2003. (Doc. 57-48).  It found 1) sufficient evidence that Sylvester had improperly pursued a personal relationship with Storey, 2) sufficient evidence that Storey transferred to Zone 7 because of Sylvester's cajoling, and 3) sufficient evidence that Sylvester's decision to make Barr acting master sergeant was based on Storey's refusal to succumb to his advances.  It found 4) insufficient evidence to suggest Sylvester ordered subordinates to scrutinize Storey's work.   Though it found 5) insufficient evidence Sylvester negatively influenced Storey's August 2002 performance evaluation because she refused his attention, it did find 6) sufficient evidence that this evaluation was not based on objection evidence.  (Doc. 57-48 at 2-4).

As the Disciplinary Review Board had already recommended that Sylvester be suspended for 60 days as a result of this conduct, the EEO felt that no further action needed to be taken against

him.  (*Id*. at 4).  Importantly, the Review Board did not file a complaint with the ISP Merit Board, a precondition to the implementation of the suspension, because Sylvester was set to retire on July 17, 2003. (Doc. 57-50).

The Director of the ISP, Larry Trent (Trent), informed Storey by letter that he determined there was evidence to suggest that she was subject to conduct in violation of two ISP policies: ISP PER-032 ("Discrimination Complaints") and PER-33 ("Harassment").   He told her he was recommending the implementation of corrective measures.  (Docs. 57-51, 57-52, 57-53).

On August 22, 2203, after Storey received the EEO's determination, she met with Brueggemann, Remelius, and Bond to discuss the resolution of her complaint.  (Doc. 57-78 at 3). Storey was quite upset when she learned that Sylvester did not lose any pay and did not have to serve any suspension.  Brueggemann told her ISP decided not to force the few days' suspension on Sylvester because it would have cost to too much money if he were to fight the suspension.  (*Id*. at 6).  Storey made it clear at the meeting that she was not pleased with Sylvester's punishment (or lack thereof).  She also told them she wanted a promotion and that she wanted to be placed in Carmi. Brueggemann told her he could not promise her a promotion, but that he would see about the transfer to Carmi.  Remelius contacted her a few days after the meeting to see if she would like to work at Carmi; she told him she planned to get a lawyer.  (Doc. 57-78 at 4).

Director Trent wrote her another letter on October 14, 2003.  In the letter, he told her he would assign her the Administrative Commander position in Carmi, which would have been a master sergeant's position, and approximately $7,000.00, to compensate for the pay she would have received if she would have remained as the acting master sergeant in Carmi.  (Doc. 57-54 at 1).  The ISP never took the measures offered by Trent in his letter, which was apparently because Storey

filed her first EEOC charge on October 2 and told Remelius she planned to get a lawyer.

C.    **Post-Investigation**

At Storey's request, Sylvester transferred her to the Public Integrity Unit (PIU) in Marion, effective January 1, 2003.  (Doc. 57-55).  According to Storey, she requested the transfer (it is not clear if she actually requested to be transferred to the PIU) because she felt she could no longer trust Barr.  (Doc. 57-77 at 6).  She lost trust in him because he told Sylvester that Storey had complained to him of Sylvester's conduct (this occurred sometime in November 2002).  (*Id.*).  Storey was displeased with her transfer to the PIU, and felt it was an inferior assignment.  She had very little work to do in her new position, and would sometimes go for a week without working on anything at all.  (Doc. 57-78 at 2).  She was so humiliated by her lack of work that she rearranged her office furniture so that others could not see her work area from the hallway.  (*Id.*).  Before working for the PIU she was a supervisor; in the new assignment, she had very little to do.

In April 2003, Storey received an employment evaluation from Oliverio, which outlined areas where she was having problems and areas where she could improve.  (*Id.*, Doc. 57-46).  This "needs improvement" evaluation was the first of her career.  In this evaluation, Oliverio said Storey needed to make more detailed reports and cut down on spelling errors.  (Doc. 57-46 at 2).  He also commented on Storey's request to assist the general criminal unit (GCU) to supplement her PIU activities, stating, "Storey has demonstrated little initiative in seeking additional responsibilities." (*Id.*).  Despite her request, Storey was not assigned her own cases in the criminal unit; Oliverio did arrange for her to make phone calls and assist in other ways on other officers' cases. (Doc. 44-4 at 5).

After the PIU disbanded, Storey went to work in the GCU.  (Doc. 57-78 at 2).  In this unit,

she was not assigned many cases and the cases she did have tended to be relatively minor.  Though common practice, she was never made acting supervisor when her supervisors were away.  (*Id*. at 2).  Because Storey felt she was not assigned enough work, she requested a transfer to patrol, where she could work with uniformed officers responding to calls and writing tickets.  (*Id*. at 3).  She requested the midnight shift so she would not have to deal with the supervisors who gave her problems.  Though this move allowed her to supervise others and rebuild her career, she considered it a "real step backwards." (*Id*.).

In the spring of 2004, FBI agent Tim Kirkham called Storey and asked if she was interested in participating on a Joint Terrorism Task Force, a unit comprising both FBI and ISP personnel, which Storey considered both a challenging and great opportunity.  Storey expressed interest and Kirkham submitted her name to his superiors in Springfield; Storey expressed her interest to her superiors by email.  (*Id*.).  The ISP posted a Vacancy Announcement (Doc. 57-58) soon after the FBI's call.  The announcement specified that the position was for special agents or troopers; Storey was a sergeant, so taking the position would have meant that she would have to be demoted.  (Doc. 44-4 at 6).  According to Storey, posting the position was unusual.  Normally, when the FBI submitted a request for a particular officer to fill a position, this person would get the assignment at her existing rank, and the position would not be posted.  Storey did not follow through after her original email because she was unwilling to take the pay cut and demotion.

### D.     ISP's Equal Employment Opportunity Policy

At all times relevant to this dispute, ISP had a policy prohibiting sexual harassment and discrimination.  (Doc. 44-6 at 12, 44-7 at 1).  It has a class on its sexual harassment and discrimination policies in its academy and ISP employees receive training to refresh their recollection

of these policies every three to four years.  The ISP EEO policies allow ISP employees to make claims of discrimination to the EEO and have those claims investigated internally by the EEO and the DII. Storey was familiar with these policies and knew she could have her claims investigated by the EEO, at the latest, in December 2001.  (Doc. 44-3 at 6, 13).

## ANALYSIS

Storey's complaint contains four counts: the first and second against ISP, for sexual harassment and retaliation in violation of Title VII, respectively, the third against Sylvester for constitutional violations made actionable by 42 U.S.C. § 1983, and the fourth against Sylvester and Stehley under § 1983.

**I.      Storey's Motion to Dismiss**

Storey has moved to dismiss her claims against Stehley. (Doc. 59).  ISP and Stehley construed this motion as one to dismiss her claims voluntarily, pursuant to Federal Rule of Civil Procedure 41(a), and indicated they were not opposed to the motion. (Doc. 60).   The Court similarly construed the motion and ordered Sylvester to show cause why it should not dismiss Storey's claims against Stehley.  (Doc. 61).   Sylvester has not responded.   Construing his failure to respond as a tacit stipulation of dismissal, the Court finds that all parties have stipulated to Stehley's dismissal from this action.  Storey's motion to dismiss is **GRANTED** and her claims against Stehley are dismissed **WITH PREJUDICE**.

**II.     Sylvester's Motion for Summary Judgment**

Storey brings her claim against Sylvester pursuant to 42 U.S.C. § 1983.  She claims he sexually harassed her and discriminated against her based on her gender.  The Seventh Circuit has held that the equal protection clause contains a "federal constitutional right to be free from gender

discrimination that does not serve important governmental objectives and is not substantially related to those objectives." *Bohen v. City of East Chicago, Ind.*, 799 F.2d 1180, 1185 (7th Cir. 1986) (internal quotation marks and citations omitted); *King v. Bd. of Regents of Univ. of Wisc.*, 898 F.2d 533, 537 (7th Cir. 1990). Sexual harassment is a form of gender discrimination that violates the equal protection clause. *Bohen*, 799 F.2d at 1185; *McPhaul*, 226 F.3d at 566.

Sylvester claims he is entitled to summary judgment because Storey's claims against him are barred by the applicable statute of limitations, which, in federal courts in Illinois, is two years. *Henderson v. Bolanda*, 253 F.3d 928, 931 (7th Cir. 2001). In her deposition, Storey testified that Sylvester engaged in no overtly sexual harassing behavior after December 2, 2002. (Doc. 38-2 at 5). As such, Sylvester claims her filing of the complaint on January 31, 2005, was too late.

Because the standard of proof in a sexual harassment claim under § 1983 is essentially the same as under Title VII, *Murray v. Chicago Transit. Auth.*, 252 F.3d 880, 887 (7th Cir. 2001), and under Title VII, a "hostile work environment claim is comprised of a serious of separate acts that collectively constitute one unlawful employment practice[,]" *Hildebrandt v. Ill. Dept. of Natural Res.*, 347 F.3d 1014, 1032 (7th Cir. 2003) (internal quotation marks and citations omitted), Storey claims ISP's failure to take effective remedial action (occurring in August 2003) brings her claim within the limitations period under *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116-17 (2002).

In *Morgan*, the Supreme Court held that Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside" the limitations period. *Morgan*, 536 U.S. at 105. The Court went on to hold, however, "that consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the

-14-

statutory time period." *Id*.  This concept applies with equal force to § 1983 claims. *Hildebrandt*, 347 F.3d at 1036 n.18.  Therefore, the question becomes whether ISP's failure to take remedial action should be considered in her hostile environment claim against Sylvester.

Storey's argument with respect to ISP's failure to take effective remedial action is flawed. Essentially, she seems to suggest that this failure contributed to the hostility of her environment, for purposes of her claim against Sylvester.  This argument lacks support both in fact and law.  In the first place, the record demonstrates that ISP took Sylvester out of her chain of command almost immediately after she filed her complaint. She admits that he engaged in no harassing activity after January 8, 2003.  While ISP's alleged failure to punish Sylvester is relevant in assessing the applicability of an affirmative defense to its vicarious liability, Storey has not adequately tied this failure to punish Sylvester to the hostile environment Sylvester created.

In support of her arguments on this score, Storey offers *Shanoff v. Ill. Dept. of Human Servs.*, 258 F.3d 696, 703-04 (7th Cir. 2001).  There, the Court noted, "an employer's knowledge of the harassment and negligent failure to take effective remedial measures are normally prerequisites to an employer's being made liable for the harassment." *Id*. at 703.  It held, however, that the plaintiff could not rely on this failure for the application of the continuing violation doctrine because its failure became apparent before the limitations period had run.  *Id*. at 704.  Because, at that time (*i.e.*, before *Morgan*), a Title VII plaintiff had to "demonstrate that he sued as soon as it was reasonable for him to conclude that his supervisor's harassment had created an intolerable working environment[,]" *see Galloway v. Gen. Motors Serv. Parts Operations*, 78 F.3d 1164 (7th Cir. 1996), and the plaintiff failed to take action within 300 days of this fact becoming apparent, the Court held he was not entitled to the application of the continuing violation doctrine.  *Id*. at 703-04.  In *Morgan*, the

Supreme Court rejected *Galloway* to the extent it held that a plaintiff cannot base a suit on conduct that occurred outside the limitations period unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on that conduct.  536 U.S. at 106, 117 n.11.  This would seem to cut in Storey's favor if *Shanoff* were not meaningfully distinguishable.

First, Shanoff sued his employer based on his supervisor's actions, not his supervisor in his personal capacity.  Concepts of ISP's negligence and awareness have no bearing on Storey's claim against Sylvester.  They are not even relevant to her prima facie case against ISP, insofar as an employer is strictly liable for the harassing conduct of its supervisors.  *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004).  Of course, awareness and knowledge would come into play with respect to the applicability of ISP's affirmative defense to Sylvester's liability, *see Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Molnar v. Booth*, 229 F.3d 593, 600 (7th Cir. 2000), but again, this has no relevance to her claim against Sylvester personally.  The last bit of actionable conduct took place, at the latest, on January 8, 2003, when the corrected copy of Barr's memorandum when into Storey's file.  This took place more than two years before Storey filed her complaint.  Therefore, this claim is barred by the statute of limitations and Sylvester's motion for summary judgment is **GRANTED**.

**III.    ISP's Motion for Summary Judgment**

In Counts I and II, Storey has sued the ISP for sexual harassment and retaliation in violation of Title VII of the Civil Rights Act.  ISP claims it is entitled to summary judgment on both claims.  It believes the harassment claims is barred by the statute of limitations and meritless regardless.  It claims her retaliation claim shares the same fate because she has failed to put forth sufficient evidence of actionable retaliation.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). In determining the existence of a genuine dispute of material fact, the Court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath*, 211 F.3d at 396. This standard is applied with special scrutiny in cases, such as employment discrimination cases, that often turn on issues of intent and credibility. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

If the moving party meets its burden, the nonmoving party has the burden "to go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006) (internal quotation marks and citations omitted); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas*, 209 F.3d at 692. Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *Insola v. Phillip Morris Inc.*, 216 F.3d 596 (7th Cir. 2000).

A.    **Storey's Sexual Harassment Claim against ISP (Count I)**

    i.    **Statute of Limitations**

Title VII forbids employment discrimination against "any individual" based on that individual's sex. 42 U.S.C. § 2000e-2(a). Before an employee can bring under this provision she must timely file a charge with, and receive a "right to sue letter" from, the EEOC. 42 U.S.C. § 2000e-5(b), (e) and (f); *Zugay v. Progressive Care, S.C.*, 180 F.3d 901, 902 (7th Cir. 1999). A claim is time-barred under Title VII if a plaintiff fails to file a charge with the EEOC within 300 days of the alleged "unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). Storey filed her first complaint with the EEOC on October 2, 2003. Accordingly, any discrete acts taken before December 6, 2002 are not actionable. *Morgan*, 536 U.S. at 114. Storey concedes as much and only puts forth evidence in support of her hostile environment claim.

The Supreme Court has interpreted the phrase "unlawful employment practice" broadly in the context of hostile environment claims. *Id*. at 115. As the Court stated in *Morgan*, a "hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice." *Id*. (internal quotation marks and citations omitted). For this reason,

> [i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurr[ed] within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Id*. at 117. Like Sylvester, ISP claims the last overtly sexually harassing behavior occurred sometime between November 14, 2002 and December 2, 2002, when Sylvester asked her, "When are we going to go out again?" (Doc. 44-2 at 11). As this activity took place outside of the limitations period, ISP believes Storey's claim must fail.

Storey asserts that she has stated a hostile work environment claim, which is based, in part, on activities that took place within the limitations period. Though Storey has asserted several bases

for this claim, the Court need not discuss them all because it finds that Storey has shown that the memorandum to her personal file, dated January 8, 2003, brings her claim against ISP within the limitations period.  Though this memorandum was not overtly sexual itself, it warrants consideration, as "[h]arassment is not limited to acts of sexual desire, but rather is a broad term which encompasses all forms of conduct that unreasonably interfere with an individual's work performance or create an intimidating, hostile, or offensive working environment."  *Hildebrandt*, 347 F.3d at1033 (quoting *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 692 (7th Cir.2001)); *see also Smith v. Sheahan*, 189 F.3d 529, 534 (7th Cir. 1999) ("Breaking the arm of a fellow employee because she is a woman, or, as here, damaging her wrist to the point that surgery was required, because she was a woman, easily qualifies as a severe enough isolated occurrence to alter the conditions of her employment.").  So long as this memorandum was part of a broader pattern of harassment activity taken by Sylvester because she is a woman and because she rejected his advances, it should be considered.  *See Smith*, 189 F.3d at 534.

Given Sylvester's unwanted sexual advances in May of 2001 (which, if one believes Storey's account, bordered on sexual assault), his incessant requests for dates from early 2001 until March 2002, his repeated attempts to use his status as her supervisor to entice her into accepting his propositions, his failure to promote her for personal reasons, his manipulation of Storey to get her to work in the Marion office in April 2002, his ill-fated double date scheme of July 2002, his inquiries into the nature and seriousness of her relationship with her boyfriend that month, his promotion of Barr over Storey in August 2002, his hand in Storey's negative evaluation of August 2002, his directing of Barr to document negative things about her, and his inappropriate comments to Storey in the hallway in October, it takes no great leap of imagination to conclude that he was behind the

negative evaluation she received from Barr in November. This evaluation was corrected and placed in her file January 8, 2003. As will be demonstrated below in the Court's discussion of the merits of Storey's harassment claim, there is sufficient evidence in the record for a reasonable juror to find that Sylvester ordered this negative evaluation as part of his broader campaign of harassment against Storey. Because this act took place within the limitations period, this claim is not barred by the statute of limitations.

### ii.    The Merits of Storey's Harassment Claim

To prevail on her hostile work environment claim, Storey must establish that:

(1) she was subjected to unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for employer liability.

*Quantock v. Shared Mktg. Servs, Inc.*, 312 F.3d 899, 903 (7th Cir. 2002). A hostile work environment is only actionable if "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." *Faragher*, 524 U.S. at 786 (internal quotation marks and citation omitted); *see also Harris v. Forklift Sys.*, 510 U.S. 17, 25 (1993) (Scalia, J., concurring) ("[T]he test is not whether work has been impaired, but whether working conditions have been discriminatorily altered."). The harassment need not be *both* severe and pervasive – "one extremely serious act of harassment [can] rise to an actionable level." *Haugerud*, 259 F.3d at 692. A plaintiff must also show that the harassment was both subjectively and objectively hostile. *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998).

Conduct is objectively hostile if a reasonable person would consider it hostile or abusive. *Hildebrandt*, 347 F.3d at1034. In making this determination, a court should consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *Hildebrandt*, 347 F.3d at1034.   There is no bright-line test in this regard (*e.g.*, the plaintiff need not suffer psychological harm to state a claim) and the inquiry is necessarily fact-driven and case specific.   *See Harris*, 510 U.S. at 23.

[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (quotations and citations omitted); *accord Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001).   Courts have found that "teasing about waving at squad cars, ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched a woman's arm, fingers, or buttocks" did not amount to an impermissibly hostile environment as a matter of law.   *Adusumilli*, 164 F.3d at 361-62. On the other hand, an uninvited kiss and an attempt at a second one, an attempt to remove a plaintiff's bra, and lewd proposition for sex were sufficient to state a hostile environment claim.   *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807-08 (7th Cir. 2000).

Sylvester's initial conduct toward Storey was not, in itself, actionable.   He began by asking her out on dates in early February, and continued to do so until she agreed to go out with him March 10, 2001.   Though it was clearly against ISP policy to pursue this type of relationship, that Storey agreed to go out with him indicates that this early behavior was terribly inappropriate, apart from being violative of ISP regulations.   This changed quickly on March 16, when he came to her home uninvited.   Storey admits that the two kissed at this point, but says she pushed his hands away when he attempted to touch her breasts and genitals.   His first attempt to cross this threshold, in light of the kissing, was probably not actionable in itself.   However, once Storey made him aware that she did

not want a physical relationship with him, Sylvester was on notice of the inappropriateness of such conduct. When he repeated this behavior several times in May, he knew it was unwanted. If these subsequent attempts to touch her breasts, thighs and genitals had occurred at work, such actions would be, in themselves, sufficient to show that Storey's environment was objectively hostile. *Patton v. Keystone RV Co.*, No. 05-3891, 2006 WL 2129723, at *4 (7th Cir. Aug. 1, 2006); *Worth v. Tyer*, 276 F.3d 249, 267-68 (7th Cir. 2001) ("[D]irect contact with an intimate body part constitutes one of the most severe forms of sexual harassment."). Though this conduct did not occur at work, ISP has not objected to the Court's consideration of it on that basis. Even if it had made such an argument, it is still clear that this conduct colored Sylvester's contemporaneous and subsequent conduct *at* the workplace.

After his direct approach (physically away from work and orally at work) failed, Sylvester incorporated more subtle, indirect means to garner Storey's affection. This began with his intimation in June 2001 that she could use him to get the promotion to acting master sergeant in Carmi. Though Storey spurned this suggestion, she got the position. While she held it, from July 2001 to March 2002, Sylvester continued to ask her out at work and at the gym. After the carrot failed, Sylvester tried the stick. First, in late 2001, he told Storey that Burton was going to replace her as acting master sergeant in Carmi. Though he did not follow through with this threat, he left her in a state of flux until after the holidays, when he told her that she would remain in her position indefinitely.

He continued acting in this way by orchestrating Storey's transfer to Marion in April 2002. The joint EEO/DII investigation concluded that Sylvester pressured Storey to transfer "voluntarily" to this position after Brueggemann denied his suggestion that he be allowed to transfer her there. The Court agrees that the record supports this conclusion. Regardless, under Federal Rule of Evidence

801(d)(2), these findings constitute admissions of a party-opponent.  *Allen v. Chicago Transit Auth.*, 317 F.3d 696, 700 (7th Cir. 2003).  Though Storey admits that she moved, in part, because of her familial obligations, she also testified that Sylvester had made it clear that she would not keep the acting master sergeant position for long.

Next came Grazkewicz's botched attempt at a double date, which he told Storey Sylvester had put him up to.  While these attempts at getting Storey to go on dates with him were relatively innocuous by themselves, Sylvester's manipulation of her through his power as her supervisor, taking place coincidently with these activities, gives these relatively minor incursions into her work life a more perfidious mien.  This becomes more obvious as further matters are considered.  Later in July, Sylvester paged Storey for personal reasons (*i.e.*, the double date with Grazkewicz and his wife) over one weekend.  He called her into his office the following week to determine why she failed to return his calls.  After she satisfied him with her explanations, he went on to question her about the nature and seriousness of her relationship with her boyfriend.  When she told him this was none of his business, he told her that they should date for couple of years and then get married.  Sylvester made similar overtures in September.  Despite her rejections, Sylvester continued to pursue her at work.

Sylvester continued to intersperse overt requests for dates and boorish remarks with his subtle manipulations.  Storey's August 2002 performance evaluation is another example.  Though the ISP investigation concluded that there was insufficient evidence that Sylvester ordered Oliverio to give her the negative evaluation, it did conclude that this evaluation was not objective.  Storey's case on this point is admittedly weak.  If Storey's only support for this proposition were her own statements, the Court would not consider it.  Storey has offered more, however, in the form of the testimony of Oliverio's supervisor, Commander Debra J. Landman.  When she was interviewed during the course

of the DII/EEO investigation, she said that Oliverio was "very upset" that he was "being forced to lower" Storey's ratings.  He was so worried, according to Landman, that he did not want to give Storey her ratings.  It is difficult to square this information with his claim that he only lowered her score one or two points in one category (of many) because of the information on the TRT given him by Stehley and Sylvester.  It is not clear why lowering her score one point would have made him "very upset" and unwilling to give her the evaluation. As Storey is the non-moving party, the Court must view the facts in the light most favorable to her.  In that light, when one views Storey's and Landman's accounts of the evaluation while considering Sylvester's behavior before and after this evaluation, it is not unreasonable for one to conclude that Sylvester ordered Oliverio to give Storey low ratings.

Barr's promotion to master sergeant in Marion is yet another example.  After investigating his promotion, the EEO/DII investigation concluded that there was sufficient evidence to support Storey's claim that Sylvester promoted Barr to this position because Storey refused to date him. There is evidence going both ways on this issue.  Landman told EEO/DII investigators she and the other commanding officers felt Barr was the best candidate for the promotion.  Yet Barr had a decidedly troubled employment history and was not certified for the promotion.  His file was rife with disciplinary actions for immoral and dishonest conduct.  Though he received good ratings in 2002, his ratings were substantially lower than Storey's in most of the years before he was promoted (except 1998); his ratings since 2002 have markedly declined.  Storey ratings were higher in most of the previous years and she was certified for the position.  In March, Landman heard Sylvester tell Brueggemann that Storey was his "strongest actor."  Given these facts, a reasonable juror could conclude that Sylvester denied her this promotion because she refused his advances, *i.e.* on account

-24-

of her sex. One could also reasonably conclude that she would have received the promotion had she not been an object of Sylvester's desire.  As there is no indication that Sylvester is homosexual, this is indicative of sexual nature of the discrimination and harassment.

The final act in Storey's alleged harassment campaign was the negative evaluation Storey received November 14, 2002.  Storey testified that Barr told her Sylvester had ordered him to compile documentation outlining Storey's poor performance.  The woman Storey was training at the time, Brenda Guernsey, was present for this conversation and has corroborated Storey's account.  Storey met with Barr the day before and felt that she had addressed the issues raised in the counseling report to Barr's satisfaction.  Nevertheless, Sylvester told him to put the counseling memo in writing anyway.  Storey met with Stehley and Sylvester on November 18 and discussed the issues raised in the counseling memo.  When she left this meeting, she felt she had resolved the issues raised in the counseling report and that the report would not go in her file.  This impression was proven false upon her receipt of a copy of the counseling report in the form of a memo from Barr to Stehley on December 2.  Storey immediately drafted a response letter to Stehley, but did not send it until after she met with Bond on January 6.  Stehley responded and told her that the memo would remain in her file, except that one correction (with respect to the illegal wiretap would be removed).  Again, given the testimony of Storey and Guernsey (a seemingly disinterested witness) there is enough evidence to support the conclusion that Sylvester and Stehley directed that this negative report go in her file in retaliation for Storey's refusals.  During this same period, late November, or early December, Sylvester called Storey into his office because he noticed something was wrong with her.  After she told him she was upset about the memo, he asked her when they were going to go out again.

Over the years, Sylvester coupled conscious manipulation with overt sexually harassing

behavior.  Because Sylvester held a position of substantial authority in the ISP relative to Storey, the severity of his behavior is enhanced for the present purposes.  *See Quantock v. Shared Marketing Servs., Inc.*, 312 F.3d 899, 904 (7th Cir. 2002) (emphasizing that using one's significant position of authority makes conduct more "severe" for hostile environment purposes). As his behavior became more subtle, it became more manipulative.  He tied her refusals of his sexual advances outside of work, and at work, to the advancement of her career.  When she failed to bite at the incentive, he moved on with the disincentives.  He took her away from her position in Carmi, which she liked, and caused her to work in Marion where she could be closer to him.  When she continued to reject him, he made sure she received poor evaluations and that she was not promoted.  His repeated requests for dates were certainly pervasive.  When his conduct is considered as a whole, there can be no doubt that it created an objectively hostile and abusive working environment.  As there is no dispute that Sylvester was Storey's supervisor for purposes of Title VII, ISP is liable unless it can establish its entitlement to an affirmative defense.

### iii.    ISP's Entitlement to the *Faragher-Ellerth* Defense

Under *Faragher* and *Ellerth*, ISP is entitled to establish an affirmative defense consisting of two elements: "(a) that the [it] exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the [Storey] unreasonably failed to take advantage of [the] preventive or corrective opportunities provided by [ISP] or to avoid harm otherwise." *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 952 (7th Cir. 2005) (quoting *Ellerth*, 524 U.S. at 765).  ISP must prove each element of the *Faragher-Ellerth* defense by a preponderance of the evidence.  *See Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 629 (7th Cir. 2003).

The parties do not dispute that ISP had a sexual harassment and discrimination policy in effect

during the relevant time period, that ISP cadets receive sexual harassment training in the academy, that subsequent retraining took place and that Storey followed the procedure outlined in those policies and filed a complaint with ISP's internal equal employment opportunity investigatory body.  Most of the rest of the salient facts are undisputed as well.  Storey admits that she was aware of ISP's policies on harassment and discrimination.  She also knew she had the right to have her claim investigated, at the latest, in December 2001.  Thus, it is clear that Storey waited at least thirteen months to file her claim after she had knowledge of her right to do so.  Brueggemann's orders to Sylvester are not disputed either.  He immediately notified Sylvester of Storey's complaint and ordered him to work out of the Effingham office.  He also ordered him to refrain from discussing the investigation and to stay out of Storey's chain of command.  Sylvester's harassing behavior stopped immediately.  The investigation got underway just as quickly.  The DII/EEO investigators interviewed all the relevant witnesses – over thirty.  It did not interview Sylvester, however, until April 23, 2003; over four months after the investigation began.  The EEO made its final determination July 14, 2003, and Sylvester retired three days later on July 17.

Three issues are of primary relevance to the application of the defense: (1) the effect of Storey waiting thirteen months to complain to the EEO after she was aware of her right to do so, (2) the length of the EEO/DII investigation and (3) Sylvester's lack of punishment.  Several concepts bear noting before the Court proceeds to address the parties' specific arguments on these issues. First, though usually sufficient, an employee's failure to report harassment in accordance with her employer's discrimination policy does not always mean that the employer has met the second prong of the *Ellerth* test.  *See Cerros*, 398 F.3d at 952.  By the same token then, Storey's failure to file her complaint with the EEO until January 7, 2003, does not mean, by itself, that ISP cannot be liable.

-27-

When an employer has anti-discrimination and harassment policies in effect that are policed by an internal body with the power to investigate complaints, this is a very strong indication that an employer has established the prevention aspect of the first prong.  *Id*. at 953.  In this same vein, when an employer takes "prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring" it weighs quite strongly in favor of a finding that the employer satisfied the correction aspect.  *Id*. at 954.

Though not entitled to dispositive weight, Storey has offered no evidence why she waited so long to file a complaint with the EEO.  The second prong of the *Ellerth* defense, which (essentially) requires her to take reasonable steps to prevent the harassment herself, is based on a fundamental concept imported from the general theory of damages, that a victim has the duty "to use such means as are reasonable under the circumstances to avoid or minimize the damages." *Gawley v. Ind. Univ.*, 276 F.3d 301, 312 (7th Cir. 2001).  Determining whether an employee has acted reasonably is a fact-specific inquiry.  As such, no bright-line, in terms of what constitutes a reasonable period of delay, has emerged.  For example, the Seventh Circuit has concluded that an employee acted unreasonably when she waited only six days to report the improper behavior of her supervisor. *McPherson v. City of Waukegan*, 379 F.3d 430, 441-42 (7th Cir. 2004).  In another case, however, that Court refused to find that waiting six weeks to file a complaint was unreasonable as a matter of law.  *See Hardy v. Univ. of Ill. at Chicago*, 328 F.3d 361, 365 (7th Cir. 2003).  Though "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment[,]" *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 814 (7th Cir. 1999), the Seventh Circuit has suggested that threats and intimidation can be relevant to the reasonableness determination.  *See Johnson v. West*, 218 F.3d

725, 732 (7th Cir. 2000).  Still, the Court is confident that Storey's failure to file a complaint until January 7, 2003, was unreasonable.  Though no bright line has emerged, it is reasonably clear that periods over a year are objectively unreasonable.  *Gawley*, 276 F.3d at 312 (holding that the employee acted unreasonably when she waited seven months to take advantage of the employer's formal complaint procedures); *see also Johnson*, 218 F.3d at 732 (suggesting that waiting a year to report misconduct, in the absence of threats or intimidation, is unreasonable).  In light of these cases, the Court has no difficulty concluding that Storey acted unreasonably when she failed to file a formal complaint until January 2003.  She waited almost two years after Sylvester's behavior began and at least thirteen months after she knew of her ability to file with the EEO.  Even if Storey had put forth evidence that Sylvester and others had threatened or intimidated her in an effort to keep her from filing a complaint, which she has not, waiting thirteen months would have been objectively unreasonable.

The Court also finds that ISP exercised reasonable care to prevent and correct the harassing behavior that occurred here.  As previously noted, its internal policies and internal grievance procedure almost certainly satisfy the prevention aspect of the first prong.  *See Cerros*, 398 F.3d at 953-54.  At the most basic level, ISP's response kept Sylvester from harassing Storey again.  ISP transferred Sylvester to an office over a hundred miles away and took her out of his chain of command.  That these measures worked is demonstrated by Storey's admission that Sylvester did not harass her again after January 8, 2003.   In the plainest sense of the term, these measures corrected Sylvester's behavior.  Nevertheless, Storey attempts to hang her hat on other elements of the investigation.  Primarily, she contends the timing of the EEO's final report, just three days before Sylvester was set to retire, indicates that its response was not reasonable in terms of its deterrent

-29-

effect on future harassment.  Because she believes the punishment he received, a 60-day sentence that was never prepared, would not deter future conduct, or make it less likely that similar conduct would occur in the future, she believes ISP has failed to show that it is entitled to the defense.

Storey relies on *Smith v. Sheahan*, 189 F.3d 529 (7th Cir. 1999) and *Loughman v. Malnati Org., Inc.*, 395 F.3d 404 (7th Cir. 2005), for his proposition.  In *Sheahan*, the Seventh Circuit held that an employer's failure to discipline an employee can show, under some circumstances, that the employer did not take reasonable measures to remedy a hostile work environment.  189 F.3d at 535. That case is distinguishable from this case on its face for a number of reasons.  First, the person making the plaintiff's work environment hostile in *Sheahan* was a coworker, not a supervisor.  When the court spoke of the employer's negligence, it was in the context of the plaintiff's prima facie case, not in the context of the *Ellerth* defense.  Also, the harassment in *Sheahan* was broader in scope, insofar as numerous women complained about this individual for similar conduct over the course of several years.  *Id.* at 532.  When the court considered the adequacy of her employer's preventive and corrective measures, it was persuaded by the fact that the employer had *promoted* the individual after eight women had complained of his activities: the individual had similarly harassed three women before the plaintiff (he harassed the plaintiff in 1992, one woman in 1989 and two in 1991) and four women after her.  *Id.*  When these women complained, nothing happened; one supervisor even tore up a written claim after explaining, "it takes two to fight." *Id.* at 532.  In this case, once Storey complained there is no evidence that Sylvester harassed anyone else.  Thus, *Sheahan* is no help to Storey.

*Loughman* was another case involving an employer's liability for coworker harassment. There, the court simply held that to comply with its duty to remedy harassment occurring at the

hands of a coworker, "greater vigor is necessary when the harassment is physically assaultive." *Loughman*, 395 F.3d at 407.  Because some of her coworkers had physically assaulted the plaintiff, the court held that a reasonable juror could have found that "simply talking to the people involved" in these aggressive instances was an insufficient response.  *Id*.  Again, Storey's situation is quite different.  Even though Storey last alleged that Sylvester physically assaulted her in May 2001, ISP transferred Sylvester to an office over one hundred miles away until it completed its investigation. After it completed its investigation, Sylvester retired.  He was not left in a position to harass her and in fact, he did not harass her again.  Sylvester's conduct did not stop fortuitously; it stopped because of the actions taken by the ISP.

Deterrence is an objective in imposing liability for coworker harassment.  *Id*. at 508.  The Court in *Loughman* found that the employer's response to the harassment did not serve that goal in light of the complaints of numerous women about the sexually harassing conduct of numerous individuals in its employ.  It would have been reasonable for a jury to find that the employer's responses were not working because supervisors had talked to those doing the harassing ten to twenty times and the harassing behavior continued.   Here, one man was responsible for the harassment and as soon as Storey complained, the harassment stopped. There is no indication that others were harassing women in a manner similar to Sylvester and there is no indication that others picked up the slack after Sylvester left.  For this reason, Storey's situation is clearly distinguishable from that in *Loughman*.

Storey also takes issue with the timing of the investigation.  She thinks it reeks of a sweetheart deal.  As her basis for this conclusion, she points out that investigators did not interview Sylvester until April and that the report came out three days before his retirement.  In the absence

of any indications of how long these investigations normally take, the Court cannot rely on the timing of ISP's response to show that its response did not have the appropriate deterrent effect. Though Storey also points to evidence that Sylvester had manipulated other women in the course of his tenure with ISP, there is no indication that these women complained of Sylvester's behavior and that their complaints were not adequately addressed.

Storey admits that her own dissatisfaction with Sylvester's punishment does not mean that it was unreasonable. *See Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526 (7th Cir. 1993). However, she believes that simply allowing Sylvester to retire was not enough. Again, it was certainly reasonable as to her; he never harassed her again. In the absence of circumstances such as those present in *Sheahan* and *Loughman*, the Court cannot conclude that ISP's response was inadequate as a matter of law. Finally, Storey complains of ISP's failure to take corrective measures, *i.e.*, that it failed to promote her to the commanding position at Carmi and failed to pay her back pay. By her own account, however, she told Remelius that she planned to get an attorney. She claims she did not accept these measures because she thought that it would preclude her from filing a claim. Her misunderstanding of the law cannot mean that ISP is liable.

After reviewing all the evidence and the arguments of the parties, the Court concludes that ISP has sufficiently demonstrated its entitlement to the *Ellerth/Faragher* affirmative defense. Therefore, the Court **GRANTS** ISP's motion with respect to Storey's sexual harassment claim.

### B. Storey's Retaliation Claim

Title VII's anti-retaliation provision forbids an employer from "discriminat[ing] against" an employee because the employee "opposed any practice" made unlawful by Title VII or made a charge, testified, assisted, or participated in a Title VII proceeding or investigation. 42 U.S.C. §

2000e-3(a).

The Supreme Court recently expounded on the law in this area in *Burlington Northern & Sante Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006). Most importantly, it held that the standard applicable to retaliation claims is meaningfully different from that applied to a substantive discrimination offense. As the purpose of the anti-retaliation provision is to prevent "an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII's] basic guarantees[,]" limiting actionable conduct to "employment-related actions would not deter the many forms that effective retaliation can take." *Id.* at 2412. Therefore, the Court held that the anti-retaliation provision extends beyond "employment-related retaliatory acts and harm." *Id.* at 2414. All an individual need show is that "a reasonable employee would have found the challenged action materially adverse[;]" that "it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (internal quotation marks and citations omitted) (adopting the formulation set forth by the Seventh and District of Columbia Circuits).

Because Title VII was not meant to be "a general civility code", the Court concluded that the anti-retaliation provision does not immunize employees from "those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* Rather, the provision "seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms." *Id.* (internal quotation marks and citations omitted). The standard set forth in *White* is objective, and it requires courts to pay careful attention to the context in which retaliatory actions took place. It is important to note, however, that a court need not consider the discrimination that caused the employee to engage in the protected activity in the first place. *Id.* at 2416.

To establish a retaliation claim under Title VII, a plaintiff may use the direct method or the indirect, burden-shifting method adapted from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 559 (7th Cir. 2004); *Rhodes*, 359 F.3d at 508; *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Under the direct method, the plaintiff must show that she engaged in a statutorily protected activity and because she did so, her employer took an action materially adverse to her. *Rhodes*, 359 F.3d at 508. Though the circumstantial evidence properly presented under the direct method is different from that presented under the indirect method, if a plaintiff can prove, using circumstantial evidence, that she "engaged in a protected activity . . . and as a result suffered the adverse employment action of which she complained" she can proceed under the direct *method*, without offering direct *evidence* of discriminatory intent. *Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 902-03 (7th Cir. 2006). Further, evidence presented under the direct method need not necessarily comprise a "convincing mosaic of circumstantial evidence[;]" direct of evidence of discrimination can also consist of a "number of pieces of evidence none meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction." *Id*. at 903.

In its motion for summary judgment, ISP claims Storey has produced no direct evidence of retaliation and nothing establishing a causal relation between her complaint and the allegedly adverse action taken against her. In her response, Storey does not make clear whether she is proceeding under the direct or indirect method. Nevertheless, the Court takes her use of the "convincing mosaic" language from *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994), as indicative of her intention to use circumstantial evidence while proceeding under the direct

method.  She claims a number of actions taken by ISP were materially adverse to her:  her assignment to the PIU, the number and quality of the assignments she received in the PIU, the number and quality of assignments she received in the general criminal unit (GCU), her April 2003 "needs improvement" performance appraisal, and the denial of her transfer to the Joint Terrorism Task Force.

ISP contends that her transfer to the PIU cannot be considered in the retaliation calculus because it became effective several days before she filed her formal complaint with the EEO.  Storey disagrees.  Because she contacted Bond in mid-December, and complained of Sylvester's activities to Barr in November – and (she claims) Barr subsequently told Sylvester of her complaints – she thinks her transfer to the PIU deserves consideration.  Certainly Storey's complaint to Barr can be classified as an expression of "her oppos[ition to a] practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e-3.  The parties dispute whether Barr communicated this information to Sylvester.  The Court believes, however, that Storey has produced sufficient evidence to make this a triable issue of fact.  Unlike Storey's telling of Bond (and her assumption that this information got back to Sylvester), her assertion that Barr told Sylvester is more than just pure speculation.  *See Murray*, 252 F.3d at 888.  Additionally, the ISP's own investigation concluded that Storey's refusals of Sylvester's advances played a part in his decision to promote Barr rather than Storey in August 2002.  If this is taken as true, it is not hard to believe that Sylvester, if he knew of her complaints to Barr, would have transferred her to a "less prestigious" position.  For this reason, Storey's transfer to the PIU merits consideration.

The consideration it is due is tempered by several facts.  First, Storey requested the transfer from Barr's supervision herself.  She felt that she could not trust Barr after he told Sylvester of her

complaints.  Second, ISP claims that Storey was difficult to place because her ex-husband worked for the ISP in the GCU, and that this kept a transfer to the GCU a difficulty.  What weight this is due is unclear as well, as Storey moved to the GCU after the PIU disbanded.  It is also unclear whether Storey asked to be transferred to the PIU, or whether she made a more general request.  What is clear, is that Storey had very little to work on while she was with the PIU.  Before she transferred to the unit, its only other member, Trooper Webb, did not even have enough work to keep himself busy.  Though Storey held a higher rank than Webb did, he received the "better" assignments and she did not play a supervisory role.

Discrimination and retaliation can be both obvious and subtle.  A more subtle form of retaliation is the deliberate denial of career opportunities.  This can be done through a transfer to a less prestigious unit or a change in responsibilities that a reasonable employee would consider a setback.  These actions can constitute, given the appropriate context, materially adverse actions. *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 753 (7th Cir. 2002) (citing *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000); *de la Cruz v. New York City Hum. Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 21 (2d Cir.1996)).  If one *knows* that her decision to complain about a supervisor's illegal activities would meaningfully derail her career, would such a person hesitate to complain?  The answer must be yes.

This logic applies equally to Storey's involvement with the GCU.  In the GCU, she was supervised by Gillenwater.  Gillenwater was aware of Storey's complaint and had played a part in Sylvester's earlier campaign to get her to Marion.  While under Gillenwater, Storey received very few cases of her own; mostly she worked on other officer's cases and made phone calls.  Those cases she did work on were less "serious" and less important.  Before her complaint, she worked

serious crimes, worked undercover, worked closely with the FBI on complex conspiracy cases and trained other officers. While under Gillenwater, she had so little to do, she requested a transfer back to patrol, a serious career set back. When a transfer is essentially a demotion, a "serious professional setback and stigma to [one's] career[,]" it can be materially adverse. *Galabya*, 202 F.3d at 641 (quoting *Rodriguez v. Bd. of Educ.*, 620 F.2d 362, 365 (2d Cir.1980)). Clearly, Storey requested the transfer to patrol herself; the parties have not indicated their positions regarding whether a "constructive transfer" such is this is actionable. Regardless, the differences between her responsibilities in the GCU and her position before her complaint are stark. What made the transfer in *Rodriguez* actionable, and meaningfully different from that in *Galabya*, was that it caused a "radical change in the nature of the work." *Rodriguez*, 620 F.2d at 366. Rodriguez was transferred from her position as a junior high art teacher (a position for which she was exceptionally well qualified, given that this position had been the focus of her doctoral dissertation) to an elementary art teacher. Though seemingly insignificant, the transfer was radical because the programs at the elementary school were so different from those at the middle school level that the transfer effectively negated her twenty years' experience. *Id.* In this case, Storey went from investigating serious drug crimes, having her own cases, supervising and training others to making calls for other officers. The cases she did have were insignificant. Again, the Court finds that this sort of radical change in responsibilities could have a dissuasive effect.

Next, Storey points to her April 2003 performance evaluation. As mentioned, Oliverio (well aware of her complaint as an interviewee in the investigation) performed this evaluation. In the comments section of this evaluation, Oliverio took issue with the quality of her reports; he told her she needed to include more detail and cut out spelling mistakes. Though noting Storey's request to

be transferred to the GCU on April 11, Oliverio concluded that Storey had "demonstrated little initiative in seeking additional responsibilities." (Doc. 57-46 at 2). He also said she needed to work on her interpersonal skills. Storey admits that this evaluation, considered by itself, would be insufficient under *White*. Nevertheless, she believes it merits consideration as indicative of the situation as a whole, in light of the Seventh Circuit's recognition that negative evaluations such as hers, when coupled with other retaliatory conduct such as transfers or demotions, can be materially adverse. *See Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996).

The last retaliatory action cited by Storey is the denial of her transfer to the Joint Terrorism Task Force (JTTF). Storey considered it to be a "plum assignment" that would have offered her new challenges and opportunities. ISP claims Storey cannot complain of her failure to get the position because she did not apply for it. *See Hudson*, 375 F.3d at 558 ("If a plaintiff does not apply for a job vacancy that is posted, he cannot make a prima facie case for unlawful discrimination or retaliation under Title VII unless the plaintiff demonstrates that the employer's discriminatory practices deterred plaintiff from applying."). In her deposition, Storey testified that she was contacted by a representative of the FBI regarding her interest in the position. According to her testimony, in such circumstances, ISP would always award the job informally; that is, the FBI would contact a representative in Springfield and the job would be filled according to that recommendation. According to Storey, these positions were not previously forbidden to those of a certain rank. Here, the FBI recommended her for the position and she made an informal request to be assigned the position through email. Storey claims ISP employed a new policy when she asked to be assigned to the JTTF. For the first time, ISP used a formal job vacancy announcement and limited the pool of candidates by rank. She also noted that this policy was effectuated by the Division of Operations,

headed by Brueggemann, who, of course, was intimately involved in the investigation.   These circumstances make this case meaningfully distinguishable from *Hudson*.   There, the employee failed to present any evidence that the employer intentionally made the job posting to keep him from applying.   *Id*. at 558-59.   Here, though the evidence is tenuous, it is sufficient to raise a triable issue in this regard.

ISP is correct that the issue of causation in all of these actions is quite close.   When viewed separately, these actions are not terribly probative on ISP's discriminatory animus.   When they are all viewed together, however, one could reasonably infer that their timing is suspect.   The task force assignment is a perfect example.   Storey's testimony on this assignment borders on the paranoid. Nevertheless, if the Court credits her testimony, there is something untoward about the application of these restrictions to Storey in the first instance.   That Storey did not follow up on the vacancy announcement is not dispositive, because the record discloses that Storey followed the procedure, as she understood it, by agreeing to have her name submitted by the FBI and by informally requesting the position by email.

The Court has considered the arguments of the parties on the retaliation issue. Too many red flags come up in this case.   Storey had a significant change of fortune after she filed her complaint. She was assigned to jobs where she had nothing to do, she stopped supervising employees, she stopped training employees and stopped getting interesting work.   She had her first "needs improvement" evaluation of her career and was denied a position working with the FBI after the FBI specifically recommended that she fill it.   This had not happened before.   Of course, temporal succession does not imply causal relation.   Even so, each of the events detailed by Storey emits a "whiff" of suspiciousness.   When combined, they form a miasma.   Before she filed her complaint,

she had plenty of work to do.  After she filed it, she sometimes went more than a week without work.  Before she filed the complaint she trained and supervised other employees, afterward she did not.  When the FBI submitted Storey's name for a task force position, ISP implemented a new policy that excluded her from consideration for the position.  This is not a case where there is no "solid evidence" in the record to support the claims made.  *See Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir. 2003).  Though it is a very close call, the Court concludes that she has presented sufficient evidence to survive summary judgment.  A reasonable jury could conclude that ISP retaliated against her because she filed her complaint.  A jury could also find that its actions would dissuade a reasonable individual from pursuing her rights under Title VII.  Therefore, the Court **DENIES** ISP's motion with respect to Storey's retaliation claim.

## CONCLUSION

For the foregoing reasons, Storey's motion to dismiss her claims against Stehley (Doc. 59) is **GRANTED,** Sylvester's motion for summary judgment (Doc. 38)  is **GRANTED**, and  ISP's motion for summary judgment (Doc. 40) is **GRANTED in part and DENIED in part**.  It is granted with respect to Storey's sexual harassment claim and denied with respect to her retaliation claim.  The Clerk of Court is **DIRECTED** to enter judgment accordingly at the close of the case.

**IT IS SO ORDERED.**

**Dated: August 17, 2006.**

  s/ J. Phil Gilbert
**J. PHIL GILBERT**
**U.S. District Judge**

-40-